John SAUCEDO, Plaintiff,

v.

BROTHERS WELL SERVICE, INC., Defendant.

Civ. A. No. 75–H–2114.

United States District Court, S. D. Texas, Houston Division.

Feb. 13, 1979.

Charlie C. Williams, Houston, Tex., for plaintiff.

James W. Patterson, Houston, Tex., for defendant.

MEMORANDUM OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

COWAN, District Judge.

*Issue and Holding*

This opinion does not hold that an employer, or this specific employer, may never

institute a rule prohibiting employees from speaking foreign languages in some situations. The court merely holds that on the facts presented, it is apparent to this court that John Saucedo was discharged because of racial animus.

*Factual Background*

The case arises from the following factual background:

Brothers Well Service is a small, family-owned business operating in the El Campo area. Brothers operates "workover rigs." A workover rig is essentially a drilling rig used to work over wells with declining production.

In the oil industry generally, a rig will be operated by a crew which has as its supervisor a "tool pusher" who has reporting to him three "drillers" or operators. Each of the drillers is in charge of a "tour," consisting of an eight-hour shift. The driller has working for him three other employees, one "derrick man" and two "floor men." The work is demanding, dangerous and requires considerable teamwork. In normal oilfield practice, a tool pusher will have three drillers reporting to him because the rig, in normal oilfield drilling operations, operates around the clock.

Brothers' operation, being a "workover" operation, was somewhat different. Apparently the rigs normally operated only a regular eight-hour day and hence the tool pusher normally had only one driller reporting to him. The tool pusher, however, was in charge of the rig and dealt with the owners or supervisors of the wells.

Brothers, at the time in question, had three rigs operating and thus would have had three tool pushers supervising the three rigs. Defendant raises no question concerning the jurisdiction of the court, and it is apparent from the file that Brothers at all material times did have a sufficient number of employees to subject it to the strictures of Title VII. In addition, although the parties in no way introduced evidence concerning this matter, the court will find and knows judicially that any workover operation involves work upon oil and gas wells whose products either are shipped in or "affect" interstate commerce.

There is no persuasive evidence the Brothers has ever adopted a policy of discriminating against Mexican-Americans. Brothers operates in an environment in which approximately 30% of the population is Mexican-American. About 50% of Brothers' employees are Mexican-Americans, and Brothers employs some Mexican-American "drillers." Brothers is operated by two brothers and a brother-in-law. The two brothers are Jarrel Nohavistza and his brother.

Jarrel Nohavistza was a witness to the episode which percipitated this lawsuit and testified in detail. This court has no quarrel with Mr. Nohavistza's credibility and the court is persuaded and finds that Mr. Nohavistza has no racial animus and has not himself in any way intentionally discriminated against Mexican-Americans; however, for reasons which the court fully understands, Mr. Nohavistza permitted and impliedly approved of the conduct of his foreman in engaging in manifest racial discrimination in connection with the discharge of this individual plaintiff. The court believes that Mr. Nohavistza tolerated the supervisory conduct described herein because good tool pushers are undoubtedly hard to find.

John Saucedo, at the time of his discharge on May 25, 1972, had been employed by Brothers for only a month and a half, as a "floor man." Brothers experiences considerable turnover among its floor men, at least in part because the wages paid in this highly competitive, somewhat marginal business, are low. Saucedo, insofar as the evidence reveals, had been an entirely satisfactory employee. Saucedo's employment history and his general demeanor convinces the court that Saucedo is a reliable, hardworking employee who had done a good job for Brothers before his discharge and would have continued to do a good job were it not for the unfortunate event made the basis of this suit.

Saucedo's driller, i. e., his immediate supervisor, was John Erdelt. When Saucedo was initially employed, he went through no formal orientation and received no written safety or other rules or instructions. On the contrary, Erdelt simply picked him up at his home one morning and took him to work. Erdelt told Saucedo that "Doc" Holliday (i. e., Cleighton E. Holliday) didn't allow any "Mesican" talk.

There are a number of significant things about the manner in which Saucedo was informed of this alleged company "rule." Saucedo was not told that it was a company rule. He was simply told that "Doc" Holliday doesn't allow any "Mesican" talk. From the credible testimony, this is the only notice which Saucedo received of the purported company "rule" prohibiting the speaking of Spanish on the job. For reasons stated below, the court is skeptical that there was any really well-established, promulgated, consistently enforced, company rule calling for immediate discharge in the event any Spanish was spoken on the job; but, in any event, the credible testimony is that the only notice which Saucedo received of the rule was his conversation with Erdelt, his immediate supervisor and the driller. Erdelt also told Saucedo in this initial conference that as far as Erdelt was concerned, any one could speak any language on the job, but "Doc" Holliday simply did not tolerate any "Mesican" talk.

Cleighton E. "Doc" Holliday (hereinafter "Holliday") did not testify in person. Plaintiff offered his deposition testimony. In his deposition, Holliday claims in a very vague manner, that Saucedo, like other "Mesican" employees, was told that if he spoke Spanish at any time on the job, this would be tantamount to quitting and that as soon as they uttered any words of Spanish at any time on the job, this would be the same as a resignation. Saucedo, in effect, denied receiving any such specific instructions, and because of the vagueness of Holliday's testimony, the fact that he had no recollection of telling Saucedo this, and because of the fact that Holliday's testimony is inherently suspect in light of his subsequent conduct, the court finds as a fact that the only notice Saucedo received of the so-called company rule was his conversation with Erdelt.

Significantly, Erdelt did not tell Saucedo that the sanction for violation of the "Holliday rule" was immediate discharge or dismissal.

The episode which precipitated Saucedo's discharge did not occur during the drilling of a well. Defendant, with considerable persuasiveness, seeks to justify a rule prohibiting the speaking of Spanish during the drilling of a well. The drilling of a well, or the reworking of a well, or the operating of a drilling rig is in fact highly skilled, dangerous work, requiring close coordination between the members of the crew. Any failure of communication could lead to disastrous results. The undersigned believes, although this is here clearly dicta, that a duly and officially promulgated, efficiently communicated rule absolutely prohibiting the speaking of a foreign language during the drilling of a well or the reworking of a well, and providing for immediate discharge for violation of the rule, would be a reasonable rule for which a business necessity could be demonstrated. Saucedo's discharge, however, did not result from this type of a rule; instead it occurred in a situation in which Saucedo's only offense was the utterance of a casual Spanish phrase in a context which caused no failure of communication and no danger.

At the time of his discharge, Saucedo was not reworking a well. Instead, the rig upon which Saucedo worked, and which Holliday supervised, was in Brothers' shop for repairs. Saucedo, immediately before his discharge, had been ordered to bring a large metal part to another Mexican-American shopworker, Steve Perez, to be straightened. As Saucedo brought the heavy part to Perez, he asked Perez, in two Spanish words, where Perez wanted Saucedo to place the part. Perez replied in English, and the part was placed where it belonged. Holliday overheard Saucedo's request, and immediately intervened, told Saucedo that he had just resigned, to put on his street

clothes and that he would take him to town. This was clearly a discharge. The facts up to this point, and in fact throughout, are confirmed by the testimony of both Saucedo, Perez and Holliday.

Perez was not one of Holliday's subordinates but was a shop employee who worked directly under Jarrel Nohavistza, one of the owners. Perez, an intelligent and fairly well educated Mexican-American who was a veteran of the Vietnam war, told Holliday that a man could not be discharged for speaking Spanish on the job and that the "rule" which Holliday was purporting to enforce was a "chicken * * *" rule and that Holliday was a chicken * * * for enforcing it. With that remark Holliday assaulted Perez, striking him a number of times about the face with his fist.

Nohavistza was in the vicinity, and while he did not hear the oral interchange, witnessed Holliday's assault on Perez.

As he was instructed, Saucedo changed his clothes; Holliday took him to town and let him off at his home. Holliday was neither discharged nor reprimanded for his assault on Perez.

While this court is impressed with Jarrel Nohavistza and believes that Nohavistza basically gave credible testimony in most respects, the credibility of the company's position is damaged seriously in the court's eyes by the fact that in its communications to the Equal Employment Opportunity Commission, Brothers took the position that Saucedo had not been discharged but that Saucedo had "quit." (See paragraph 4 of Plaintiff's Exh. 2). Saucedo was clearly discharged.

It is totally clear that Holliday's breach of customary conduct is much more serious than Saucedo's and much more likely to cause safety and other problems than Saucedo's causal and harmless use of a Spanish phrase to another Mexican-American who fully understood the phrase. Under this circumstance, therefore, the action of Nohavistza in allowing Saucedo to be discharged and retaining Holliday on the payroll was clearly a breach of Brothers' obligation to avoid treating its employees discriminatorily.

A rule that Spanish cannot be spoken on the job obviously has a disparate impact upon Mexican-American employees. Most Anglo-Americans obviously have no desire and no ability to speak foreign languages on or off the job. The question in a case of this nature therefore becomes whether or not the employer can prove by a preponderance of the evidence that his "rule" requiring only English to be spoken on the job is the result of business necessity. Brothers here has not proved by credible evidence that it actually had and uniformly enforced such a rule and has not shown that there was any business necessity for a rule which would result in automatic termination in a situation like that which existed in the case at bar.

## Damages

Mr. Saucedo's case, while a highly meritorious one, is not a substantial case from the standpoint of damages. The truth is that Saucedo's job at Brothers was not the best job in the world. He earned $2.40 per hour and worked a 40-hour week. Sometimes he received overtime, but there is no proof before the court which would enable the court to make a determination as to how much overtime he would have worked during the period of time immediately after his discharge.

After his discharge he was off work for two months before he received a roughly comparable job. Since then Mr. Saucedo has been upwardly mobile and has moved on to much better paying jobs than the one he had at Brothers.

Saucedo had an obligation to mitigate damages arising from his wrongful termination, and he has done so admirably.

From the record before the court, the court is unable to determine that Mr. Saucedo sustained more than $896 in damages as a result of his wrongful termination. This consists of two months of earnings at $2.40 per hour for 40 hours per week. In addition, Mr. Saucedo should recover interest at the rate of 6% per annum from June

25, 1972, and accrued interest at the rate of 6% per annum on $896 back pay is $354.06.

Mr. Saucedo's counsel is entitled to recover reasonable attorneys fees. Mr. Saucedo's counsel has not, at this time, presented testimony in support of his claim for attorneys fees, but he has filed an affidavit. The court has examined this affidavit and the file, and has been able, by this method, to arrive at what the court at present believes to be a reasonable attorneys fee. If either party wishes to produce additional evidence on the attorneys fee question, or if counsel for defendant wishes to cross-examine Mr. Williams relating to the content of the affidavit and concerning the attorneys fee question, a hearing will be set for the 9th day of March, 1979, at 5:00 p. m. Counsel should advise the courtroom deputy within seven days of receipt of this memorandum opinion whether or not either of them wishes to appear, present additional evidence concerning the question of attorneys fees, or cross-examine Mr. Williams.

The work of prosecuting this case may be divided into three basic categories. Counsel has designated the time which he has spent in connection with each of these categories of work. The first is that period of time extending from August 18, 1975 to February 25, 1977, during which counsel for plaintiff conferred with his client, obtained the basic data from the EEOC, filed the complaint, and reviewed the defendant's original and first amended answer. Counsel has designated 18 hours of time attributable to this work, and the court believes that 18 hours of time for this work is appropriate.

Counsel has also claimed during the period of time from June 7, 1976 until July 14, 1976 a total of 50 hours of time in composing interrogatories. It does not appear to the undersigned that this time was necessary in the prosecution of the case. A basic set of interrogatories in this case could have been composed in a few minutes, and thus this 50 hours will be denied.

During the period from September 13, 1976 through the date of trial, counsel for plaintiff claims essentially 46 hours of time in dealing with routine matters in preparing the case for trial. This seems a reasonable designation of time to the court, and this 46 hours will be allowed.

It appears to the court that this case was never properly a class action, no effort should be made to prosecute it as a class action, and thus the court has excluded from the determination of attorneys fees any time attributable to preparation of the class allegations.

Actual trial of this case consumed approximately six hours, and thus the court has determined that a period of 70 hours would have been an adequate period of time in order to do all of the work of preparing and presenting this case.

The quality of the work performed by counsel for plaintiff is basically satisfactory. The case has not been a complicated or difficult one. Considering all of the factors which the court is mandated to consider by *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir. 1974), it appears to the court that an appropriate hourly rate for computing the fee of counsel for plaintiff should be $40 per hour, and thus it appears to the court that an appropriate attorneys fee in this matter would be $2,800.

Accordingly, judgment will be entered for the plaintiff for the sum of $896 back wages, $354.06 accrued interest, and $2,800 in attorneys fees.